## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**ROBERT SEEDS and LAURA SEEDS,**

     Plaintiffs,

v.                                 No. CIV 00-1341 BB/LFG-ACE

**RICHARD LUCERO, individually and in his**
**official capacity, THE CITY OF ESPANOLA,**
**JOHN LENSSEN, individually and in his**
**official capacity, ANTHONY VANDERVOSSEN and**
**KATHY VANDERVOSSEN, and SIX UNKNOWN**
**EMPLOYEES OF THE CITY OF ESPANOLA,**

     Defendants.

## OPINION

THIS MATTER comes before the Court on the defendants' motions for summary judgment (Docs. 95 and 98) on the plaintiffs' complaint (Doc. 1), wherein the plaintiffs allege that private citizens conspired with public officials to deprive them of certain constitutional rights, engage in malicious abuse of process, and inflict emotional distress upon them. The Court has examined the parties' submissions and the relevant legal authorities, and, for the reasons set forth below, finds that the defendants are entitled to summary judgment on the plaintiffs' constitutional claims and, therefore, those claims will be **DISMISSED** with prejudice. The Court declines to exercise supplemental jurisdiction over the plaintiffs' state claims and, therefore, those claims will be **REMANDED** to the First Judicial District Court, County of Rio Arriba, State of New Mexico.

## I.
## FACTUAL BACKGROUND

Plaintiffs Robert Seeds and Laura Seeds ("Seeds") commenced this suit in the First Judicial District Court, County of Rio Arriba, State of New Mexico, seeking redress under 42 U.S.C. § 1983

and New Mexico common law. Defendants Richard Lucero, John Lenssen, and the City of Espanola (collectively, "City Defendants") removed this action to the United States District Court for the District of New Mexico pursuant to 28 U.S.C. § 1441(a).

The Seeds live and reside in the City of Espanola ("City"). (See Seeds' response brief, exhibits 1 and 18.) The property upon which they reside ("Seeds Property") is located in an area that is zoned residential. (See VanderVossens' opening brief, exhibit 12.) Even though the Seeds Property is zoned residential, they individually own and operate two towing businesses within the confines of the property pursuant to a special exception Mr. Seeds obtained from the City's planning and zoning commission in December 1995. (See Seeds' exhibits 1 and 8.) The special exception expressly permits Mr. Seeds to use the Seeds property as an automobile storage yard.

Defendants Anthony and Kathy VanderVossen ("VanderVossens") live and reside on the property adjacent to the Seeds Property. (See VanderVossens' exhibit 1.) In addition to being neighbors, the VanderVossens and the Seeds are relatives and business competitors: Mr. Seeds and Ms. VanderVossen are siblings, and the VanderVossens own three towing businesses and an automobile storage yard in the City proper. (See Seeds' exhibit 2.) The property upon which the VanderVossens' businesses are located is also not zoned for such use. However, the VanderVossens are able to operate each business on the property as a prior nonconforming use.

On September 9, 1998, the VanderVossens, through their attorney, made a written complaint to the City regarding the Seeds Property. (See Seeds' exhibit 9.) The VanderVossens claimed the Seeds were violating the City's zoning ordinances by using the Seeds Property as an automobile storage yard, by operating a hunting and guide business from the property, and by placing an accessory structure on the property that was not set-back far enough from the property line. As a

result of the VanderVossens' complaint, the City sent the Seeds four cease and desist letters over the course of two days. The letters asserted the same alleged zoning violations detailed in the VanderVossens' written complaint and in their earlier oral complaints.

On September 10, 1998, Marvin Vigil, who is the director of the City's planning department, sent a letter to Ms. Seeds demanding that she cease storing towed vehicles on the Seeds Property. (See Seeds' exhibit 11.) Mr. Vigil claims that before sending the demand letter he investigated whether Ms. Seeds was storing towed vehicles on the Seeds Property. (See VanderVossens' exhibit 41.) Ms. Seeds admits that she did store towed vehicles on the Seeds Property in September 1998, but she claims that it was legal for her to do because the Seeds had an agreement allowing her to utilize Mr. Seeds' special exception. (See VanderVossens' exhibit 20.)

Also on September 10, 1998, Mr. Vigil sent two letters to Mr. Seeds. In one letter, Mr. Vigil demanded that Mr. Seeds cease conducting his hunting and guide business if, as the City had been informed, he was operating the business from the Seeds Property. (See Seeds' exhibit 12.) Mr. Vigil has stated that before sending the letter he investigated whether Mr. Seeds was operating the business from the Seeds Property. (See VanderVossens' exhibit 41.) The City subsequently demanded that Mr. Seeds obtain a home occupation license for his hunting and guide business. (See Seeds' exhibit 19.) That demand was made upon Mr. Seeds even though, prior to the demand, Mr. Seeds claims he was told by Mr. Vigil that he did not need to obtain such a license. (See VanderVossens' exhibit 48.) Mr. Vigil denies that he told Mr. Seeds any such thing.

In another letter, Mr. Vigil alleged that Mr. Seeds violated City ordinances by placing a prefabricated storage shed on the Seeds Property without obtaining the necessary permits to do so. (See Seeds' exhibit 13.) The City demanded that Mr. Seeds obtain a zoning permit and possibly a

building permit for the storage shed. Those demands were made upon Mr. Seeds even though, prior to the placement of the storage shed on the Seeds Property, Mr. Seeds claims he was told by the City's planning department that he did not need to obtain any such permits. (See Seeds' exhibit 1.) Mr. Vigil denies that he told Mr. Seeds any such thing. (See VanderVossens' exhibit 41.)

On September 11, 1998, Mr. Vigil sent a letter to Mr. Seeds alleging that his storage yard violated City ordinances despite the special exception he had obtained in December 1995. (See Seeds' exhibit 14.) According to the letter, while the storage yard was "technically authorized" by Mr. Seeds' special exception, it violated a home occupation ordinance barring any "change to the outside appearance of the building or premises." (Id.) The City demanded that Mr. Seeds screen his property from adjacent properties. Mr. Seeds complied with the City's demand by erecting a wooden fence around the Seeds Property. (See Seeds' exhibit 1.)

On September 24, 1998, Mr. Vigil sent a memorandum to the manager and assistant manager of the City stating that Ms. Seeds was not storing towed vehicles on the Seeds Property. (See Seeds' exhibit 15.) Based on that finding, Mr. Vigil requested that Ms. Seeds' towing business be removed from the City's towing rotation list, because every towing business that appears on the towing list is required to have an approved storage lot within the City. (See id.) The towing list accounts for a substantial portion of Ms. Seeds' towing business. (See Seeds' exhibit 18.)

Soon thereafter, Mr. Vigil filed a criminal complaint against Ms. Seeds, alleging that she "has [allowed] or is allowing vehicles to be stored" at the Seeds Property. (See Seeds' exhibit 16.) The complaint was sent to the wrong address, so Ms. Seeds did not appear in municipal court to answer the charges and an order to show cause was issued. Due to the lack of notice, the municipal court dismissed the complaint on the motion of Ms. Seeds' attorney.

On October 16, 1998, the VanderVossens filed a petition with the City in which they requested that Mr. Seeds' special exception be declared illegal, null, and void. (See Seeds' exhibits 20 and 21.) In support of their petition, the VanderVossens argued *inter alia* that they were entitled to receive notice of the December 1995 meeting on the special exception, that they did not receive such notice, that they would have opposed the granting of the special exception if they had received notice, and that they were unaware that a special exception had been granted until shortly before they filed their petition in October 1998. (See id.)

On December 1, 1998, the City Council heard the VanderVossens' petition requesting the nullification of Mr. Seeds' special exception. (See VanderVossens' exhibit 1.) Defendant Richard Lucero ("Mayor"), who is Mr. VanderVossen's uncle, recused himself from participating in the hearing on the VanderVossens' petition. The City Council denied the VanderVossens' petition as the result of a 4-4 tie vote on a motion to grant the petition.

After the City Council denied the petition, Defendant John Lenssen, who is the attorney for the City, sent a memorandum to the City Councilors advising them that their vote violated the VanderVossens' civil rights. (See Seeds' exhibit 37.) Mr. Lenssen stated that as a result of their vote the City faced liability for monetary damages and attorney fees. Prior to becoming the City's attorney, Mr. Lenssen represented the VanderVossens in two legal matters, one that concluded in 1996 and another one that concluded in 1997. He has been Mr. VanderVossen's friend for more than twenty years. (See id.)

On December 18, 1998, the VanderVossens appealed the City Council's decision to the First Judicial District Court, County of Rio Arriba, State of New Mexico. (See VanderVossens' exhibit 1.) Without specific authorization from the City Council, Mr. Lenssen filed a brief on behalf of the

City in which he argued that the City Council's decision violated the VanderVossens' due process rights, including their rights to notice and an opportunity to be heard. (See Seeds' exhibit 37.) The district court ruled in favor of the VanderVossens, concluding that there was no evidence that notice was properly given to the persons entitled to notice, including the VanderVossens.

The Seeds appealed the district court's decision to the New Mexico Court of Appeals, arguing that if the VanderVossens had actual notice of the meeting, then their appeal was untimely. The court of appeals agreed with the Seeds, reversed the district court's decision, and ordered that the case be remanded to the City Council for a factual determination of when the VanderVossens first learned of Mr. Seeds' special exception. See VanderVossen v. City of Espanola, 24 P.3d 319, 327 (N.M. App. 2001). The VanderVossens appealed the court of appeals' decision to the New Mexico Supreme Court, which initially granted their petition for writ of certiorari but later quashed it. The case is now pending before the district court on remand.

The Seeds maintain that the VanderVossens had actual notice of the December 1995 meeting. According to the Seeds, they met with the VanderVossens prior to the meeting and discussed Mr. Seeds' application for the special exception. (See Seeds' exhibits 1 and 18.) Ken Norris, a member of the City's planning and zoning commission at the time, has stated that Mr. VanderVossen contacted him prior to the meeting and asked him to support Mr. Seeds' application. (See Seeds' exhibits 18-25.) Ms. Seeds, Mr. Norris, and Ron Roybal, the chairman of the planning and zoning commission at the time, have stated that they saw Mr. VanderVossen at the meeting. (See id.)

On February 9, 1999, Mr. Vigil filed another complaint against Ms. Seeds, alleging that her towing company did not have an approved storage facility for cars that were towed to the Seeds Property. (See VanderVossens' exhibit 29.) Mr. Lenssen prosecuted the complaint pursuant to Rule

8-111(E) of the New Mexico Rules Annotated. The complaint was dismissed in July 1999 pursuant to an agreement entered into between Ms. Seeds and the City, wherein Ms. Seeds agreed to and did provide a memorandum from Mr. Seeds granting her the right to store towed vehicles at the Seeds Property. (See VanderVossens' exhibit 30.)

On March 1, 1999, Mr. Vigil filed a complaint against Mr. Seeds, alleging that he had placed the storage shed on the Seeds Property without obtaining a zoning permit and that he had occupied the storage shed without obtaining a certificate of occupancy. (See VanderVossens' exhibits 37-39.) The following day, after receiving the complaint, Mr. Seeds called Mr. Vigil to inquire into why the City was pursuing the zoning issues against him with such vigor. Mr. Seeds tape-recorded the telephone conversation and then had the tape-recording transcribed ("First Transcript").[1] He subsequently had a certified court reporter transcribe the tape-recording ("Second Transcript"). The following excerpts from the First Transcript appear in both transcripts in substantially the same form and are representative of the conversation:

Mr. Vigil:      Hello.

---

[1] The VanderVossens and the City Defendants (collectively, "Defendants") claim the Seeds cannot rely upon the Second Transcript in response to their motions for summary judgment, because it "has not been authenticated in any way as the transcript of an actual telephone conversation with Marvin Vigil." See, e.g., VanderVossens' reply brief at 5. The Court addressed this issue at a hearing on the VanderVossens' motion to strike, ruling that it would not consider the Second Transcript in deciding the Defendants' summary judgment motions because the Seeds failed to timely produce the Second Transcript along with the tape itself. However, the Court also ruled that it would consider the First Transcript. It is proper for the Court to do so because the Seeds have stated, and the Defendants have not denied, that the First Transcript was produced in their initial disclosures and was made an exhibit to Mr. Vigil's deposition. See Anderson v. Cramlet, 789 F.2d 840, 845 (10th Cir. 1986) (ruling that a letter obtained in response to request for production of documents was admissible on motion for summary judgment, even though it was not properly supported by sworn affidavits); Payne v. Collins, 986 F.Supp. 1036, 1056 (E.D.Tex. 1997) (holding that "unauthenticated" report, which was part of initial disclosures and was attached as exhibit to deposition, was admissible for purposes of summary judgment); In re Greenwood Air Crash, 924 F.Supp. 1511, 1514 (S.D.Ind. 1995) ("Production of a document by a party constitutes an implicit authentication of that document."). Should the Defendants present substantial evidence that the tape recording (and hence the transcripts) is a fraud, as the Court expressly permitted them to do in its ruling on the VanderVossens' motion to strike, the Court will revisit the parts of its ruling affected thereby. See Hemmert v. Quaker Oats Co., 157 F.Supp.2d 864, 880 (S.D.Ohio 2000) (reserving the right to revisit its ruling if movant failed to authenticate documents upon which the Court relied in granting summary judgment).

| | |
|---|---|
| Mr. Seeds: | Marvin. |
| Mr. Vigil: | Yeah. |
| Mr. Seeds: | Robert. What are you trying to do to me? |
| Mr. Vigil: | With what? |
| Mr. Seeds: | With this new paper that I just got? What's going on? With the shed. |
| Mr. Vigil: | For the _____ . |
| Mr. Seeds: | The shed. |
| Mr. Vigil: | The shed. |
| Mr. Seeds: | Yeah. I just [got] a summons to court because of a shed, a structure. And it has your name on the bottom of it. |
| Mr. Vigil: | Yeah. That's one of the ones that they're still pushing. |
| Mr. Seeds: | Whose [sic] they. Lenssen again. |
| Mr. Vigil: | Uh huh. |
| Mr. Seeds: | Oh man. Gee, partner, it's going to drive me, put me in the hospital. |
| Mr. Vigil: | You and me both. |

. . .

| | |
|---|---|
| Mr. Seeds: | I know partner. I know you have nothing to do with it but they're putting your name on the bottom, you know. |
| Mr. Vigil: | Yeah. |
| Mr. Seeds: | What can they do to you if, I mean, if you just do a ___ and don't do it? Will they hurt you? |
| Mr. Vigil: | Yeah. I have been reminded that my letter of resignation has never been accepted. |
| Mr. Seeds: | Who told you that? |

| | |
|---|---|
| Mr. Vigil: | Leonard [Padilla]. |
| Mr. Seeds: | Leonard, the new City Manager. He's an asshole. He's Richard's cron[y]. You know. |
| Mr. Vigil: | Definitely. |
| Mr. Seeds: | You know. He does what Richard tells him. |
| Mr. Vigil: | Yeah. |
| Mr. Seeds: | See that's why they squeeze[d] Max out see because Max finally saw the light you know what I mean? |
| Mr. Vigil: | Uh huh. |
| Mr. Seeds: | He finally realized that you know hey you know these things aren't right, you know, and he put the brakes on and they got rid of him, you know, but hey. |
| Mr. Vigil: | You should be getting another one and what I'm doing, Robert, is I'm trying to delay them and blow them off as much as I possibly can, but I cannot do it indefinitely. |
| Mr. Seeds: | I know. I know. |
| Mr. Vigil: | You know. They're basically, they're fucking with you. I know they're fucking with you. |
| Mr. Seeds: | I know. |
| Mr. Vigil: | But there's not a whole lot I can do about it. I really wish there was. |

. . .

| | |
|---|---|
| Mr. Seeds: | Yeah. Well, it's just getting costly. Do you know what I mean? It's what they want. They want to break me down inch by inch, you know. |
| Mr. Vigil: | Uh huh. |
| Mr. Seeds: | Well, it's working. |

. . .

| | |
|---|---|
| Mr. Vigil: | Well, they had me working on trying to find the easement. |

| Mr. Seeds: | Who had you do that? |
|---|---|
| Mr. Vigil: | Anthony and John. |
| Mr. Seeds: | How can Anthony tell you what to do? |
| Mr. Vigil: | The way it basically came down is that it would be greatly appreciated by the Mayor if I did it.  You know.  Just a few su[b]tle bullshit threats like that.  It pisses me off. |

. . .

| Mr. Vigil: | I'm sorry, Robert.  I wish if I can find some way to help you, I will. |
|---|---|
| Mr. Seeds: | Well, you know what and I know you will do the right thing.  You know.  And I know that this isn't right, but I know what's going on.  I know Richard. |
| Mr. Vigil: | Please understand I'm between a rock and a hard place. |

Although the complaint was eventually dismissed pursuant to an agreement entered into between Mr. Seeds and the City, wherein Mr. Seeds agreed to obtain a zoning permit for the storage shed, the Seeds claim that Mr. Vigil's statements evidence the City Defendants' ulterior motives for prosecuting the zoning complaints against them.  The Seeds further claim that Mr. Vigil's statements echo an earlier statement made by the Mayor to Mr. Seeds.  According to Mr. Seeds, he asked the Mayor why the City was pursuing the zoning issues against him.  (See City Defendants' opening brief, exhibit K.)  The Mayor allegedly responded by stating that Mr. Seeds had thrown the "first stone" by challenging a zoning request made by the VanderVossens to the City Council.

The Seeds argue that the Defendants endeavored to "get" them for two reasons:  (1) the Mayor dislikes Mr. Seeds, who also is active in politics and has served on the City Council, because Mr. Seeds supported another candidate for mayor in the City's 1998 mayoral election, and (2) the Mayor was supporting his relatives, the VanderVossens, who allegedly failed to receive approval of an annexation request because of Mr. Seeds and who would benefit if the Seeds were put out of the

towing business. Based on their belief that the VanderVossens and the City Defendants conspired with one another to "get" them, the Seeds brought this lawsuit, claiming that they endured severe emotional distress and incurred over $30,000 in legal expenses fighting the zoning grievances made against them.

## II.
## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In evaluating a motion for summary judgment, this Court must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. See Martin v. Kansas, 190 F.3d 1120, 1129 (10th Cir. 1999). The weighing of evidence and the assessment of credibility are functions to be performed by a jury, not by a trial judge. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Baum v. Gillman, 648 F.2d 1292, 1295-96 (10th Cir. 1981) ("Any action when examined under Rule 56 which raises real issues of credibility, motive, or intent is not suitable [for summary judgment].").

The party moving for summary judgment bears the burden of showing that no genuine issue of material fact exists. See Adams v. American Guarantee and Liability Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000). However, because the moving party does not bear the ultimate burden of persuasion at trial, it does not have to negate the nonmovant's claim. See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir.1998). Rather, the moving party may meet its summary judgment burden by "pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." Id. at 671. Once the movant meets its initial burden, the nonmovant must

identify evidence that would enable a trier of fact to find in the nonmovant's favor. See Considine v. Newspaper Agency Corp., 43 F.3d 1349, 1356 (10th Cir. 1994); Thomas v. Wichita Coca-Cola Bottling Co., 968 F.2d 1022, 1024 (10th Cir. 1992).

## III.
## DISCUSSION

### A.    SECTION 1983 CLAIMS

The Seeds seek redress from both the City Defendants and the VanderVossens pursuant to 42 U.S.C. § 1983. Section 1983 imposes civil liability upon any person who, while acting under the color of state law, deprives another person of any rights, privileges, or immunities secured by the Constitution or the laws of the United States of America. See 42 U.S.C. § 1983; Carey v. Continental Airlines, Inc., 823 F.2d 1402, 1404 (10th Cir. 1987) ("The provisions of § 1983 only apply to persons who both deprive others of a right secured by the Constitution or laws of the United States and act under color of a state statute, ordinance, regulation, custom or usage.").

### 1.    State Action

The VanderVossens move for summary judgment on the Seeds' constitutional claims on the ground that, as private citizens, they allegedly have not acted under the color of state law. It is true that the only appropriate defendants in a Section 1983 action "are those who represent the state in some capacity . . . ." Anaya v. Crossroads Managed Care Systems, Inc., 195 F.3d 584, 595 (10th Cir. 1999). Thus, in order for private citizens to be amenable to suit under Section 1983, the evidence must show that they acted in concert with public officials to deprive the plaintiffs of their federal rights. See id. at 596. That burden may be satisfied if the evidence establishes that private citizens and public officials conspired with one another to violate the plaintiffs' federal rights. See id.; Singer v. Fulton County Sheriff, 63 F.3d 110, 119 (2nd Cir. 1995) ("[A] § 1983 claim may be

proved by showing that a person acting under color of state law collaborated or conspired with a private person to deprive the plaintiff of a constitutional right.").

The VanderVossens claim that their involvement in this case is limited to making verbal and written zoning complaints to the City regarding the Seeds Property, which they are permitted to do under the City's zoning ordinance and the First Amendment. According to the VanderVossens, they did not file the City's zoning complaints against the Seeds nor did they participate in Mr. Vigil's decisions to file, prosecute, or settle those complaints. Rather, it was Mr. Vigil's decision to issue the demand letters and prosecute the zoning complaints after receiving the VanderVossens' grievances, independently investigating the grievances, and then determining that the grievances were well-grounded in fact and in law. Certainly, if their claims were supported by undisputed material facts, the VanderVossens would be entitled to summary judgment because private citizens do not engage in state action merely by voicing grievances to public officials who subsequently decide to prosecute the grievances after conducting an investigation and exercising their independent judgment. See Scott v. Hern, 216 F.3d 897, 906 (10th Cir. 2000) (" A private individual does not engage in state action simply by availing herself of a state procedure."); Benavidez v. Gunnell, 722 F.2d 615, 618 (10th Cir. 1983) (furnishing information to enforcement officials insufficient to render private citizens liable as state actors under Section 1983).

In response, the Seeds contend that the VanderVossens greatly understate their involvement in the City's decision to prosecute the complaints. The Seeds point to the conversation that allegedly took place between Mr. Seeds and Mr. Vigil on March 2, 1999. In that conversation, Mr. Vigil may be understood to say that he filed the complaints against the Seeds, not because he felt compelled to do so as the City's planning director ("I'm trying to delay them and blow them off as much as I

possibly can, but I cannot do it indefinitely."), but because he faced termination if he did not do so ("I have been reminded that my letter of resignation has never been accepted."). Mr. Vigil also may be understood to say that the City Defendants were pursuing the grievances against the Seeds because the Mayor demanded such action ("That's one of the ones that they're still pushing." . . . "The way it basically came down is that it would be greatly appreciated by the Mayor if I did it.") as a means of harassing the Seeds ("They're basically, they're fucking with you. I know they're fucking with you.").

The Court agrees with the VanderVossens that Mr. Vigil is not their agent and that his admissions may not be imputed to them under Fed.R.Evid. 801(d)(2)(D), as the Seeds contend. The issue then becomes whether there is other evidence, either direct or circumstantial, implicating the VanderVossens' involvement in the aggrieved conduct. See United States v. Hanzlicek, 187 F.3d 1228, 1232 (10th Cir.1999) (stating that the elements of a conspiracy "may be proven by direct or circumstantial evidence."); United States v. Harrison, 942 F.2d 751, 755-56 (10th Cir.1991) (stating that the important questions in a conspiracy claim are "whether the alleged co-conspirators were united in a common unlawful goal or purpose" and whether their actions exhibit "interdependence"). In order to connect the VanderVossens to Mr. Vigil's admissions, the Seeds rely upon an inculpatory statement allegedly made by the Mayor to Mr. Seeds. When asked by Mr. Seeds why the City was pursuing the VanderVossens' zoning grievances against the Seeds with such zeal, the Mayor allegedly responded to the question by stating that Mr. Seeds had thrown the "first stone" by interfering with the VanderVossens' attempt to annex an alley into the City limits.

The Mayor's statement, if true, strongly suggests that the City's power was brought to bear on the Seeds in retaliation for Mr. Seeds interfering with the VanderVossens' annexation request.

14

A reasonable inference is that the VanderVossens enlisted the help of their uncle to get back at the Seeds because Mr. Seeds had thrown the "first stone" at them. To conclude otherwise at the summary judgment stage, one would have to forget that within two days of receiving the VanderVossens' complaint Mr. Vigil, apparently under pressure, issued four demand letters to the Seeds asserting the same alleged zoning violations set forth in the complaint. A jury could reasonably conclude that a conspiracy existed between the VanderVossens and the Mayor based on the circumstances surrounding the aggrieved conduct. See Fisher v. Shamburg, 624 F.2d 156, 162 (10th Cir. 1980) ("Direct evidence of a conspiracy is rarely available, and the existence of a conspiracy must usually be inferred from the circumstances.").

When the foregoing evidence is considered as a whole and viewed in the light most favorable to the Seeds, the Court concludes that a jury could reasonably find that the VanderVossens exerted undue influence over the City Defendants because of their close relationship with the Mayor, and that they conspired with the Mayor to harass the Seeds in retaliation for Mr. Seeds challenging their annexation request. Such evidence, albeit circumstantial, is sufficient to transform the VanderVossens into state actors for purposes of Section 1983 analysis. See Wagenmann v. Adams, 829 F.2d 196, 209 (1st Cir.1987) (concluding that close relationship between private citizen and deputy chief, together with circumstantial evidence that citizen in effect requested deputy chief to have police officers arrest plaintiff, raised inference that citizen was more than a "mere complainant" and that a "meeting of the minds" occurred between citizen and police officers sufficient to warrant finding that citizen was state actor); Mark v. Furay, 769 F.2d 1266, 1273-74 (7th Cir. 1985) (allegations that private citizen defendants conspired with police to have felony warrants issued on false information sufficient to state claim for state action).

The fact that the VanderVossens and the City Defendants may be amenable to suit under Section 1983 based on the facts and circumstances of this case does not by itself entitle the Seeds to any relief, however, because Section 1983 is merely a grant of a right of action. See Southwest Air Ambulance, Inc. v. City of Las Cruces, 268 F.3d 1162, 1173 (10th Cir. 2001). The substantive right giving rise to a cause of action must come from another source. See id. Thus, "although the pleading of a conspiracy will enable a plaintiff to bring suit against purely private individuals, the lawsuit will stand only insofar as the plaintiff can prove the *sine qua non* of a § 1983 claim: the violation of a federal right." Singer, 63 F.3d at 119. As explained below, the Seeds have failed to come forward with admissible evidence to support their constitutional claims.

### 2.    Constitutional Violations

The City Defendants move for summary judgment on the Seeds' constitutional claims on the grounds that the Seeds allegedly have failed to assert the actual deprivation of a federal right and, even if they have done so, the City Defendants are nevertheless entitled to qualified immunity. When defendants properly raise the defense of qualified immunity in the summary judgment context, this Court must undertake a two-step analysis. The Court must first consider whether the plaintiffs have asserted the violation of a federal right. See Anaya, 195 F.3d at 593. If the plaintiffs have done so, the Court must next consider whether the federal right violated by the defendants' alleged conduct was clearly established at the time of the violation such that a reasonable person in the defendants' position would have known that the alleged conduct violated the federal right. See id.

Because the Seeds' claims turn on the City Defendants' subjective motives for sending the demand letters and prosecuting the zoning complaints, this Court must refine its analysis of whether the Seeds have asserted the violation of a federal right. First, the Court must consider whether the

City Defendants have made "a prima facie showing of the objective reasonableness of the challenged conduct." Gehl Group v. Koby, 63 F.3d 1528, 1535 (10th Cir. 1995) (quotations omitted), *overruled on different issue by* Patel v. Wooten, 2001 WL 788639 (10th Cir. Jul 12, 2001). If the City Defendants satisfy their burden of showing objective reasonableness, the Court must next consider whether the Seeds have satisfied their burden of presenting evidence that the City Defendants "acted on the basis of a culpable subjective state of mind." Gehl Group, 63 F.3d at 1535.

### a)       **Objective Reasonableness**

The City Defendants, largely through the testimony of Mr. Vigil, have presented admissible evidence that they issued the letters and prosecuted the complaints only after receiving numerous grievances from the VanderVossens, independently investigating the grievances, and then determining that the grievances were well-grounded in fact and in law. Such evidence is sufficient to make a prima facie case that the City Defendants' conduct was objectively reasonable. See id.; Foy v. Holston, 94 F.3d 1528, 1536 (11th Cir. 1996) (ruling that investigation prior to taking action renders conduct objectively reasonable even though investigation may have derived from bias).

Furthermore, the evidence conclusively shows that Ms. Seeds was storing towed vehicles on the Seeds Property in Fall 1998, as alleged in one demand letter and in two criminal complaints made against Ms. Seeds, and that Mr. Seeds' storage shed was not set-back far enough from his property line, as alleged in one demand letter and in one criminal complaint made against Mr. Seeds. Such evidence is more than sufficient to make a prima facie case that the City Defendants' conduct was objectively reasonable in those instances. See Gehl Group, 63 F.3d at 1536 ("A showing of probable cause . . . clearly establishes objective reasonableness.").

In response, the Seeds first argue that the City Defendants cannot meet their burden of showing objective reasonableness because the criminal complaints "were dismissed without any finding that there had been a violation of the law." Seeds' response brief at 8. This argument ignores the fact that one complaint was dismissed because Ms. Seeds was not properly served and that the other three complaints were dismissed only after the Seeds agreed to fulfill certain conditions demanded by the City. By entering into stipulated agreements with the City, the Seeds foreclosed the possibility of any legal finding that they had violated the City's zoning ordinances. They cannot now rely upon those agreements to prove that the City Defendants' actions were objectively unreasonable. Even if the complaints had been dismissed on the merits, the Seeds would not be able to rely upon that fact alone to make their point, because there is no logical inconsistency between a finding of objective reasonableness and the dismissal of criminal charges. See Gehl Group, 63 F.3d at 1536, fn. 11 ("[T]he mere fact that charges were ultimately dismissed does not demonstrate that there was no reasonable basis for bringing the charges initially.").

The Seeds next argue that the criminal complaints "were filed in conjunction with a flurry of letters from the City threatening different actions against the Seeds." Seeds' response brief at 8. The Court understands the argument to be that the City's letters, not unlike the complaints, allegedly were issued without objective cause. The strongest evidence the Seeds have to support that argument is Mr. Seeds' testimony that he contacted the City about obtaining permits for his guide business and his storage shed and that both times he was told that no permits were necessary, only to find out by the complaints made against him that he had allegedly violated the law by lacking such permits. While that testimony, if true, may rebut the City Defendants' justification for issuing the demand letters and prosecuting the zoning complaints, it does not change the fact that the City Defendants have made

a prima facie showing of the objective reasonableness of their conduct, which is all that they are required to do.

### b)     State of Mind

The Seeds contend that even if the City Defendants' conduct was objectively reasonable, there is substantial evidence in the record indicating that the City issued the demand letters and prosecuted the criminal complaints out of sheer malice.  As noted above, the Mayor allegedly told Mr. Seeds that the City was pursuing the zoning issues against the Seeds because he had thrown the "first stone" by challenging an annexation request made by the VanderVossens to the City Council.  The Mayor's statement squares with Mr. Vigil's statement in the March 2, 1999 conversation captured in the First Transcript:  "They're basically, they're fucking with you.  I know they're fucking with you."  Both statements, viewed together, give rise to the reasonable inference that the City's power was brought to bear on the Seeds as a means of retribution.

In response, the City Defendants deny the existence of the Mayor's statement and argue that the Seeds read too much into Mr. Vigil's statements.  They point out that Mr. Vigil was asked at his deposition to explain what he meant by the statement "I know they're fucking with you."  After first claiming that he did not remember making the statement, Mr. Vigil adopted the question and then stated:  "In the context this was done that probably they were fucking with him.  They were fucking with him because he was not in compliance with the laws of the City of Espanola. . . .  So they might have been fucking with him with regards to getting him to comply with the rules and regulations of the City of Espanola."  City Defendants' exhibit L.

At this stage in the proceedings, the Court must construe the evidence, including Mr. Vigil's statement, in the light most favorable to the Seeds.  Thus, the Court finds that the Seeds have

presented admissible evidence that the City issued the demand letters and prosecuted the criminal complaints because of the Mayor's deep-seated animosity for Mr. Seeds. They also have presented admissible evidence from which a reasonable inference may be drawn that the Mayor did not act alone, but that he acted in concert with the VanderVossens, Mr. Lenssen, Mr. Padilla, and Mr. Vigil. In doing so, the Seeds have satisfied their burden of presenting admissible evidence that the City Defendants "acted on the basis of a culpable subjective state of mind." Gehl Group, 63 F.3d at 1536; see Harrison v. Springdale Water & Sewer Comm., 780 F.2d 1422 (8th Cir. 1986). Accordingly, the Court must go on to consider whether the Seeds have presented admissible evidence that the aggrieved conduct amounts to a violation of the Seeds' federal rights.

### c) **Federal Rights**

Having advanced sufficient evidence of malice, the Seeds must still advance sufficient evidence that the Defendants' actions actually deprived the Seeds of constitutionally protected rights. The Seeds allege that the Mayor accomplished his malicious purpose by coercing Mr. Vigil to issue demand letters and prosecute zoning complaints against the Seeds for infractions that other persons, including the VanderVossens, also had committed but who escaped any type of scrutiny. According to the Seeds, the Defendants' vindictive motive for singling them out for prosecution violates their First Amendment right to freedom of association and their Fourteenth Amendment right to equal protection under the laws.

### 1) **First Amendment**

The City Defendants contend that the Seeds' First Amendment claim must be dismissed, because there is no admissible evidence in the record that the Mayor retaliated against the Seeds based on his failure to support the Mayor's candidacy in the 1998 election, which is the basis for the

Seeds' political association claim. They point out that Mr. Seeds has called the Mayor "a liar" in public. See City Defendants' exhibit K. Mr. Seeds has explained that the Mayor's "personal vendetta" for him stems from the fact that he is "not the type of person that fits into Richard's way of doing things. Richard is a dictator and nothing happens at city hall unless Richard Lucero gives it approval or denial . . . ." Id. The Court agrees with the City Defendants that a prosecution motivated by a personal vendetta, without more, does not state a claim under the First Amendment. See Gehl Group, 63 F.3d at 1534-35 ("Although Plaintiffs have demonstrated that Defendants exhibited some hostility toward the FOP, they have not introduced evidence that the hostility was rooted in disapproval of the FOP's protected activity . . . .") (emphasis added); Jantzen v. Hawkins, 188 F.3d 1247, 1251-52 (10th Cir. 1999) (ruling that plaintiff must show that his political affiliation was a substantial and motivating factor in defendant's actions in order to establish a political association claim under the First Amendment).

The evidence currently in the record, viewed in the light most favorable to the Seeds, indicates that the Defendants decided to "get" them because Mr. Seeds threw the "first stone" at the VanderVossens. Mr. Seeds' testimony that the Defendants decided to harass the Seeds because he campaigned against the Mayor approximately six months before the letters were issued is pure speculation without evidentiary support. Thus, while the Mayor's reason for pushing the complaints against the Seeds may implicate their First Amendment right to free speech, it does not implicate their First Amendment right to affiliate. See Conn v. GATX Terminals Corp., 18 F.3d 417, 419 (7th Cir. 1994) (stating that a plaintiff can plead himself out of court with an overly prolix complaint). The Seeds have expressly abandoned any free speech claim set forth in their complaint, so that issue is not

before the Court.  See City Defendants' exhibit A.  Accordingly, the Seeds' First Amendment claim based solely on political affiliation will be dismissed.

### 2)   Fourteenth Amendment

The City Defendants contend that the Seeds' Fourteenth Amendment claim, which the City Defendants characterize as a "substantive due process claim tied to selective municipal code enforcement," must be dismissed on the grounds that:  (1) the Seeds are not members of a protected class; (2) the Seeds allegedly stipulated that they have suffered no deprivation of life, liberty, or property; and (3) there is no evidence in the record to support such a claim.  Although the City Defendants misstate the law governing the Seeds' claim and fail to recognize that the Seeds seek redress under both the substantive due process clause and the equal protection clause of the Fourteenth Amendment, the Court must nevertheless dismiss the Seeds' constitutional claims for the reasons set forth below.

### (a)   substantive due process

The substantive due process clause guarantees that the state will not deprive a person of life, liberty, or property for an arbitrary reason.  See Hennigh v. City of Shawnee, 155 F.3d 1249, 1253 (10th Cir.1998).  Rights protected by due process are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."  Jones v. University of Cent. Okla., 13 F.3d 361, 365 (10th Cir.1993).  In order to state a substantive due process claim, a plaintiff must establish possession of a life, liberty, or property interest to which due process protection attaches.  See Clinger v. New Mexico Highlands Univ., 215 F.3d 1162, 1167 (10th Cir.2000).

The Seeds admit that the only property loss they have sustained as a result of the Defendants' aggrieved conduct is the payment of attorney fees. They have not cited, and the Court has not located, any authority showing that the payment of attorney fees is an interest to which due process protection attaches. Furthermore, the Tenth Circuit has specifically stated that a "Section 1983 malicious prosecution claim does not implicate the Fourteenth Amendment's substantive due process standards." Taylor v. Meacham, 82 F.3d 1556, 1561 (10th Cir. 1996) *citing* Albright v. Oliver, 510 U.S. 266 (1994); see Gehl Group, 63 F.3d at 1539 (indicating that malicious prosecution claims should be addressed and analyzed under the constitutional provisions most closely associated with the aggrieved conduct); Singer, 63 F.3d at 115 ("[A] claim of malicious prosecution may not be brought as a substantive due process claim."). Accordingly, the Seeds' substantive due process claim will be dismissed.

**(b)** **equal protection**

The Seeds allege in their complaint that the "actions of all Defendants as described herein deprived Plaintiffs equal protection of the laws." While neither the Seeds nor the Defendants directly addressed the equal protection claim in their briefs, the City Defendants specifically stated in their summary judgment brief that there is "absolutely no evidence of selective enforcement" in the record and the Defendants attached several pages of Mr. Vigil's deposition testimony containing evidence relevant to the Seeds' equal protection claim. With regard to removing Ms. Seeds' towing company from the E-911 call rotation, for example, Mr. Vigil was asked, "Was this – is this a harsh enforcement action or is this . . . ." He responded that it was "Typical." City Defendants' exhibit L. When asked whether he had "taken any action against any other towing companies in the City," Mr. Vigil responded, "Yes." Id. Also at his deposition, Mr. Vigil was challenged as to why he informed

Mr. Seeds how to comply with City ordinances regarding the special exception for his storage yard but did not tell Ms. Seeds how to clear a citation for operating her towing business from the Seeds Property, Mr. Vigil again resorted to standard operating procedure:

> Q: So in some circumstances you will tell people what they need to do to conform to the law and in other circumstances you won't?

> A: No. That [Mr. Vigil informing Mr. Seeds about the requirements attending to his special exception] was a requirement from the Board of Adjustments. The Board of Adjustments requires you to get a home occupation license, and therefore it's incumbent upon me to advise him what he needs to do to comply with that. It is not incumbent on me to point out loopholes in the law for members of the public. That is the way I understand my job to be.

VanderVossens' exhibit 40.

When asked about the fact that he issued four different violations to the Seeds within a short period of time, Mr. Vigil explained as follows:

> Q: Would it be your practice if you simply – an attorney started complaining to you, that you would start sending letters to people, to one family, since they were letters –

> . . .

> A: I would send letters after conducting, again, an inspection.

> Q: Did you conduct the inspection before sending each of these letters?

> A: Yes, I did.

> Q: So if a complaint is made, you will inspect it and send a letter?

> A: Typically, yes.

City Defendants' exhibit L; VanderVossens' exhibit 41.

In order to sustain an equal protection claim, the Seeds must plead and prove that they were treated differently than those similarly situated. See Tonkovich v. Kansas Bd. of Regents, 159 F.3d 504 (10th Cir. 1998) ("[A]t the heart of any equal protection claim must be an allegation of being

treated differently than those similarly situated."); <u>Lawmaster v. Ward</u>, 125 F.3d 1341, 1347 (10th Cir. 1997) ("Where we address the issue of qualified immunity in the summary judgment context, the plaintiff must present some evidence to support the allegations; mere allegations, without more, are insufficient to avoid summary judgment.").  Once the defendants have pointed out to the court a lack of admissible evidence supporting an essential element of the plaintiffs' claim and have advanced admissible evidence that the plaintiffs were treated as others were treated, as the City Defendants and the VanderVossens have in this case, the burden then shifts to the plaintiffs.  See <u>Adler</u>, 144 F.3d at 671; <u>Considine</u>, 43 F.3d at 1356.

The Court must consider whether the Seeds have supported their allegations of unequal treatment by referencing depositions, answers to interrogatories, admissions on file, or affidavits.  See Fed.R.Civ.P. 56(c).  Because they have completely failed to support their factual allegations with admissible evidence, the Court must dismiss the Seeds' Fourteenth Amendment equal protection claim.  See <u>Gehl Group</u>, 63 F.3d at 1538 ("Plaintiff's equal protection claim must fail because they have not made even the threshold showing that they were treated differently than other similarly situated [persons].").  Having concluded that the Seeds failed to establish that the VanderVossens and the City Defendants violated their constitutional rights, the Court does not reach the issue of whether the law upon which the Seeds rely was clearly established at the time of the City Defendants' alleged conduct.  See <u>id.</u>  Accordingly, the Seeds' constitutional claims will be dismissed.

**B.    STATE CLAIMS**

The Seeds seek redress from the City Defendants and the VanderVossens under New Mexico common law for malicious abuse of process, intentional infliction of emotional distress, and prima facie tort.  The state claims turn in large part on the allegation that the VanderVossens' petition to

overturn the special exception Mr. Seeds obtained in December 1995 was based on the canard that they did not know the special exception had been granted until shortly before filing their petition in October 1998. The factual issue of when the VanderVossens first learned of the special exception is currently pending before the state district court. See VanderVossen, 24 P.3d at 327. In light of that fact and the venerable principle that state claims should be resolved in the state courts, this Court declines to exercise supplemental jurisdiction over the Seeds' state common law claims. This Court will remand the Seeds' state common law claims to the First Judicial District Court, County of Rio Arriba, State of New Mexico. See Carnegie-Mellon University v. Cohill, 484 U.S. 343, 351 (1988) (ruling that federal district court, after dismissing federal claims, has discretion to remand to state court a removed case involving pendent claims upon determination that retaining jurisdiction over the case would be inappropriate); Albertson's, Inc. v. Carrigan, 982 F.2d 1478, 1481 (10th Cir.1993) (stating that after dismissing a plaintiff's federal claims, "a district court has the discretion to remand pendent state claims upon a proper determination that retaining jurisdiction over the case would be inappropriate.") (internal quotation omitted).

## IV.
## CONCLUSION

For the reasons set forth above, the Court finds that the defendants are entitled to summary judgment on the plaintiffs' constitutional claims. The plaintiffs' state claims will be remanded to state court, the Court declining to exercise supplemental jurisdiction over those claims. An Order in conjunction with this Opinion will issue.

DATED at Albuquerque this 21st day of December, 2001.


_____
BRUCE D. BLACK
United States District Judge



**Attorneys:**

For Plaintiffs:

    Scott F. Voorhees, Santa Fe, N.M.

For Defendants:

    Frank T. Herdman, Santa Fe, N.M.
    R. Galen Reimer, Albuquerque, N.M.